**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| FRED ROUSE, :<br>:<br>      Plaintiff, :<br>:<br>v. :<br>:<br>ERIC FANNING, SECRETARY, :<br>DEPARTMENT OF THE AIRFORCE, :<br>:<br>      Defendant. :<br>: | CASE NO.:  5:13-CV-261 (LJA) |

## ORDER

    Before the Court is Defendant Eric Fanning's Motion for Summary Judgment. (Doc. 16.) For the following reasons, Defendant's Motion is **GRANTED**.

## PROCEDURAL HISTORY

    Plaintiff Fred Rouse commenced this action on July 22, 2013, alleging discrimination on the basis of his race and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (the "ADEA"). (Doc. 1.) Plaintiff also alleged that he was subjected to sexual harassment and that he was suspended in retaliation for filing six equal employment opportunity complaints between February 2006 and October 2010, both in violation of Title VII. (*Id.*)

    Defendant moved for summary judgment on December 10, 2014. (Doc. 16.) On December 29, 2014, two days before his response was due, Plaintiff requested a 14-day extension pursuant to Local Rule 6.2 ("Plaintiff's First Request"). (Doc. 17.) Defendant did not raise any objections to Plaintiff's First Request. (Doc. 18.) While no ruling was issued, had Plaintiff's First Request been granted, Plaintiff's response would have been due on January 14, 2015. Yet, rather than filing a response on or before January 14, 2015, Plaintiff moved on January 21, 2015, a full week beyond the maximum 14-day extension period, for an additional extension of "at least seven (7) days," contending that he should be afforded

the opportunity to file a response because "the Court never issued a formal extension." (Doc. 19.) Notably, Plaintiff did not file a response at the time he filed the final request for an extension.

On February 5, 2015, the Court denied Plaintiff's Motion for an Extension of Time to Respond, finding that Plaintiff had failed to demonstrate sufficient good cause warranting an additional extension under Local Rule 6.2 or excusable neglect under Federal Rule of Civil Procedure 6(B)(1)(B). (Doc. 21.) Despite the fact that Plaintiff did not file a response to Defendant's Motion for Summary Judgment, the Court has considered the merits of Defendant's Motion to ensure that it is supported by evidence in the record and that the Defendant has met its burden of demonstrating the absence of a genuine issue of material fact.

## **FACTUAL BACKGROUND**[1]

Plaintiff, a sixty-six-year-old African-American male, was employed as an Electronic Integrated Systems Mechanic WG-2610-12 in the 559th Aircraft Maintenance Squadron ("AMXS") at Robins Air Force Base in Warner Robins, Georgia (the "Base"). (Doc. 16-1 at ¶ 1.) In December 2009, Plaintiff was transferred to the 559th AMXS to begin servicing C-5 aircraft after previously working on C-17 aircraft. (*Id.*) During his time with the 559th AMXS, Plaintiff claims that he was subjected to three alleged discriminatory acts: (1) an adverse performance evaluation; (2) a ten-day suspension for allegedly violating a technical order and an operating instruction; and (3) a hostile work environment resulting from a derogatory statement made to him by a coworker who, at the time, was serving as his acting supervisor.

### I. Performance Evaluation

On April 27, 2011, Plaintiff received what he perceived to be a negative performance evaluation for the April 1, 2010 to March 21, 2011 appraisal period. (Doc. 16-1 at ¶ 3.)

---

[1] The relevant facts are derived from the Complaint (Doc. 1), Defendant's Answer to the Complaint (Doc. 7), Defendant's Statement of Undisputed Facts (Doc. 16-1), and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in the light most favorable to Plaintiff as the nonmoving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Plaintiff's rating was assigned by Roy Rudd, a supervisory industrial production manager and Plaintiff's second level supervisor, and reviewed by Kevin Hamilton, a supervisory production manager and Plaintiff's third level supervisor. (*Id.*) Plaintiff alleges that his team lead, Larry Hamilton, should have rated him. (Doc. 1 at ¶ 12.) However, Plaintiff's fourth level supervisor, Michael Doubleday, stated that it was "entirely appropriate and consistent with applicable rules and regulations that Roy Rudd assigned the rating on Plaintiff." (Doc. 16-8 at ¶ 7.)

For the relevant period, Plaintiff received a total rating of 61 out of 81 points for nine appraisal factors.[2] (Doc. 16-1 at ¶ 3.) In all nine factors, Plaintiff was rated from "slightly above fully successful," which translated to six points in the nine-point rating system, to "far above successful," which translated to eight points in the nine-point rating system. (*Id.*) During the preceding appraisal period, Plaintiff initially received a rating of 67, which was later increased to 75 as part of an employment grievance settlement. (*Id.*) Plaintiff alleges that a "drop of fifteen (15) points is especially significant because it indicates deficiencies in work performance over a variety of graded areas." (Doc. 1 at ¶ 12.) Plaintiff further alleges that other "similarly situated white employees received a higher evaluation score than" he did. (*Id.* at ¶ 13.)

Doubleday, however, stated that he did not consider Plaintiff's rating "low" and that the rating would not, and did not, unfavorably impact Plaintiff's employment. (Doc. 16-8 at ¶ 6.) Likewise, Hamilton stated that he did not consider Plaintiff's rating a downgrade, considering that Plaintiff had assumed more responsibilities and was working on a new aircraft. (Doc. 16-1 at ¶ 13.) Rudd concurred, stating that he did not counsel Plaintiff because he did not view his rating as reflecting a downward trend in Plaintiff's performance. (*Id.*)

**II.   Ten-Day Suspension**

On June 1, 2011, Plaintiff was suspended for ten days as punishment for two violations: (1) the failure to adhere to a technical order related to the repair of drain bottles

---

[2] Although Plaintiff alleges that he received a rating of 60, (Doc. 1 at ¶ 7), the record evidences that he received a rating of 61. (Doc. 16-4 at 148-49.)

3

on an aircraft and (2) the unauthorized use of another employee's Production Acceptance Certification ("PAC") maintenance stamp.

On April 15, 2011, David Clark, a quality assurance specialist, noted that moisture had accumulated in pitot/static drain bottles on an aircraft. (Doc. 16-1 at ¶ 2.) Clark reported his findings to Ismael Grimes, who in turn sent Plaintiff and Tommy Sheppard, another electronics mechanic, to check on the problem. (*Id.*) After checking the problem, Plaintiff attempted to replace the drain bottles. (*Id.*) During the process, however, the drain fittings broke. (*Id.*) Plaintiff allegedly failed to fully cap the opening where the bottles were connected. This failure was a violation of Technical Order 1C-5A-2-6, Par. 1-12 Step d, which requires that all openings, hoses, and tubing be capped to prevent entry of foreign materials into the aircraft system. (*Id.*)

Plaintiff alleges that Grimes assigned Sheppard the responsibility of capping all openings, hoses, and tubing on the aircraft. (Doc. 1 at ¶ 16.) Grimes, however, stated that he only instructed Plaintiff and Sheppard to check the drain bottles for moisture and that he never instructed Plaintiff to replace the drain bottles or assigned Sheppard the responsibility of capping the openings, hoses, and tubing. (Doc. 16-6 at 40-41.) According to Grimes, Plaintiff "took it upon himself to change the bottles;" and, therefore, he was responsible for capping the openings where the bottles broke. (*Id.* at 41.) Furthermore, Doubleday stated that Plaintiff's assertion that he was told not to cap the opening "is not a valid defense to the violation." (Doc. 16-8 at ¶ 11.)

Also in April of 2011, Plaintiff was alleged to have used the PAC maintenance stamp belonging to another employee to certify a repair that Plaintiff had completed. PAC maintenance stamps are "[i]ssued to production maintenance personnel for certifying accomplished maintenance tasks." (Doc. 16-9 at 2.) Operating Instruction 21-19 ("OI 21-19") requires stamper holders to protect their "stamp from unauthorized use by other production employees." (*Id.* at 4.) In accordance with OI 21-19, the Base performs an annual certification review for each employee in possession of a PAC stamp, requiring each employee to certify that they will not loan their stamp for improper certification or use any

4

stamp other than the one issued to them. (Doc. 16-10.) Plaintiff completed the certification review on February 25, 2011. (Doc. 16-1 at ¶ 15; *see also* Doc. 16-10.)

On April 29, 2011, Clark discovered a perceived defect with the wiring of a GPS antenna on an aircraft. (Doc. 16-1 at ¶ 14.) The PAC maintenance stamp belonging to Greg Stephens, who like Plaintiff was an Electronic Integrated Systems Mechanic, was used to certify a prior repair of the antenna. (*Id.*) When Stephens was questioned by his supervisor, Richard Dunagan, about the repair of the antenna, Stephens informed Dunagan that Plaintiff had completed the work on the antenna and asked Stephens for his PAC stamp to certify the repair. (Doc. 16-1 at ¶ 14.) When initially confronted by Dunagan, Plaintiff admitted that he had asked Stephens for his PAC stamp and that he had used the stamp to certify the repair of the antenna. (*Id.*) Plaintiff also acknowledged to Doubleday that Stephens had given him his stamp, but Plaintiff maintained that he had never asked Stephens for it. (Doc. 16-8 at ¶ 12.) Plaintiff subsequently admitted to completing the repair, but denied ever using Stephens' stamp to certify completion of the repair. (Doc. 16-1 at ¶ 14.) In his Complaint, Plaintiff alleges that he never received proof of any violation. (Doc. 1 at ¶ 19.)

On June 1, 2011, Doubleday issued Plaintiff a Notice of Proposed Suspension, proposing a fourteen-day suspension for Plaintiff's failure to follow Technical Order 1C-5A-2-6 and violation of OI 21-19. (Doc. 16-1 at ¶ 16.) On June 15, 2011, Doubleday heard Plaintiff's reply to the proposed suspension, determining that Plaintiff had failed to raise a sufficient defense to the alleged charges. (*Id.*) Nevertheless, Doubleday reduced Plaintiff's suspension to ten days without pay. (*Id.*) Doubleday deemed this punishment appropriate, given "the seriousness of the charges and Plaintiff's history of prior violations, including a violation for which he was suspended for 5 days in 2008 and a violation for which [Doubleday] suspended him [for] 10 days in 2010, for direct disobedience." (Doc. 16-8 at ¶ 14.) On July 11, 2011, a Notice of Decision to Suspend was delivered to Plaintiff, suspending him from July 25, 2011 to August 3, 2011. (Doc. 16-1 at ¶ 16.)

### III.   **Sexual Harassment**

Plaintiff alleges that on July 11, 2011, Stephens approached him in the avionics shop and, while holding his crotch, Stephens stated that he "had something for Plaintiff that 'was

black and had white cream on it.'" (Doc. 1. at ¶¶ 34, 36; *see also* 16-7 at 109.) Plaintiff further alleges that Stephens told him to get on his "knees because Stephens wanted to put 'it' in Plaintiff's mouth." (Doc. 1. at ¶ 38.) Plaintiff allegedly did not respond to Stephens because he was conversing with other co-workers and because Stephens was his acting supervisor at the time, in the absence of his actual supervisor, Timothy Mills. (*Id.* at ¶¶ 35, 37, 40; *see also* 16-8 at ¶ 19.)

When Mills returned to work on or about July 13, 2011, Plaintiff informed him of the altercation with Stephens. (Doc. 1 at ¶ 40.) On July 15, 2011, Mills and his supervisor, Larry Hamilton, met with Plaintiff to discuss the incident. (Doc. 16-1 at ¶ 18.) Following the meeting, Mills instructed Plaintiff and Stephens to provide written statements of the incident while he collected statements from other employees who were present. (*Id.*) Two of the employees stated that they did not hear anything obscene or inappropriate. (Doc. 16-7 at 89-90.) Two other employees stated that Stephens told Plaintiff that he had something black with white cream in it and that Plaintiff responded by telling Stephens to "whip it out." (*Id.* at 87-88.) According to one of the employees, these types of remarks were a "common occurrence" between Stephens and Plaintiff. (*Id.* at 87.) The employee described the altercation as a "normal conversation between the two" and did not believe the comments sounded sexual in nature. (*Id.*)

After collecting all of the statements, Mills met with Plaintiff on July 18, 2011. (Doc. 16-1 at ¶ 18.) At the meeting, Plaintiff denied feeling threatened or uncomfortable working on the same shift as Stephens, and refused Mills' offer to change shifts. (*Id.*) Based on Larry Hamilton's instructions, Mills separated Plaintiff and Stephens by assigning them to different aircrafts. (*Id.*) Following his complaint, Plaintiff has stated that no further sexual harassment has occurred. (*Id.*)

## **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts." *Matsuhita*, 475 U.S. at 586 (citations and internal quotations omitted). Instead, the nonmovant must point to evidence in the record that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form") (quotation omitted). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

"[S]ummary judgment cannot be granted as a sanction for merely failing to file a response to a motion for summary judgment." *Trustees of Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1040 (11th Cir. 2004). Rather, a court "must consider the merits of the motion." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). The court, however, is under no duty to "*sua sponte* review all of the evidentiary materials on file," *id.*, or "distill every potential argument that could be based upon the materials before it." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). "It is not for the court to manufacture arguments on Plaintiff's behalf." *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp. 2d 1228, 1236 (M.D. Ala. 2000). Instead, the court is required only to review "the evidentiary materials submitted in support of the motion for summary judgment" in order to ensure that the defendant has met its burden of demonstrating the absence of a genuine issue of material fact. *Real Property*, 363 F.3d at 1101.

## ANALYSIS

### I. Racial Discrimination

Plaintiff contends he was subjected to disparate treatment and discriminated against on the basis of his race when he received his employment evaluation and the ten-day suspension. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

"A plaintiff may establish a claim of illegal disparate treatment through either direct evidence or circumstantial evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004) (citation omitted). Where a claim is established by circumstantial evidence, courts

apply the burden-shifting "framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* at 1087.

"Direct evidence is evidence, which if believed, proves existence of fact in issue without inference or presumption." *Burrell v. Bd. of Trustees of Georgia Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (quotations and citation omitted). The Eleventh Circuit has defined "direct evidence of discrimination as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson*, 376 F.3d at 1086 (quotations, citations, and alterations omitted). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Id.* The record is devoid of any direct evidence of discrimination regarding Plaintiff's employment evaluation and his ten-day suspension. Plaintiff's claim instead relies on circumstantial evidence.

Under the *McDonnell Douglas* paradigm, Plaintiff must first establish "a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally." *Id.* To establish a *prima facie* case for racial discrimination, Plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] was subjected to adverse employment action; (3) [his] employer treated similarly situated white employees more favorably; and (4) [he] was qualified to do the job." *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008). If Plaintiff can satisfy these elements, then the burden shifts to Defendant to "provide a legitimate, nondiscriminatory reason for their action." *Id.* If Defendant meets this burden, Plaintiff must then prove that Defendant's "reasons are a pretext for unlawful discrimination." *Id.* Based on the evidence before the Court, Plaintiff has failed to establish a *prima facie* case for racial discrimination arising out of his performance evaluation and suspension.

First, Plaintiff has failed to establish that his performance evaluation constitutes an adverse employment action. An adverse employment action requires a "*serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis provided). In making this

determination, "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Although Plaintiff's asserts that his performance evaluation reflected poorly on his work in several graded areas, he has not offered a shred of evidence that the terms, conditions, or privileges of his employment were materially changed or affected as a result of the evaluation. To the contrary, Plaintiff's supervisor unequivocally stated the rating would not, and did not, unfavorably impact Plaintiff's employment. (Doc. 16-8 at ¶ 6.) In fact, Plaintiff's supervisors did not consider Plaintiff's rating low or a downgrade from his previous rating because Plaintiff was working on a new aircraft and had assumed more responsibilities. Therefore, because Plaintiff has failed to demonstrate that his performance evaluation led to a tangible, materially adverse employment action, Plaintiff's claim is not actionable. *See Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006) (holding that a "lower score on [plaintiff's] performance evaluation, by itself, is not actionable under Title VII unless [plaintiff] can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities"); *Davis*, 245 F.3d at 1240 (finding that job performance memoranda did not constitute an adverse employment action where plaintiff "did not suffer any tangible consequence from this memo, in the form of a loss of pay or benefits or further discipline").

Furthermore, Plaintiff has failed to demonstrate that he was treated less favorably than a similarly situated white employee. As part of his *prima facie case*, Plaintiff "must show that his employer treated similarly situated employees outside his classification more favorably." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). It is not enough for Plaintiff to simply show that he "belongs to a protected class and that [he] did not violate [his] employer's work rule." *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 794 (11th Cir. 2011) (citing *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 n. 6 (11th Cir. 1998)). Instead, Plaintiff must identify a comparator who is "similarly situated in all relevant respects." *Wilson*, 376 F.3d at 1091 (quotations and citation omitted).

In determining whether employees are similarly situated, courts "consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Wilson*, 376 F.3d at 1092.

Plaintiff has not identified a similarly situated employee outside of his protected class who received a more favorable performance evaluation based on the same course of conduct exhibited by Plaintiff during the relevant appraisal period. In fact, Plaintiff does not identify any employee at all. Instead, Plaintiff simply alleges that "similarly situated white employees received a higher evaluation score." (Doc. 1 at ¶ 13.) Such a general allegation fails to satisfy Plaintiff's burden of identifying a sufficient comparator. As such, Plaintiff has failed to establish a *prima facie* case of racial discrimination arising out of his performance evaluation.

Likewise, Plaintiff has not identified a similarly situated employee outside of his protected class that was treated more favorably after committing the same violations that led to his suspension. Instead, Plaintiff simply recites the elements of a *prima facie* case of racial discrimination. (*Id.* at ¶ 26.) Moreover, when questioned during the investigation into Plaintiff's equal employment complaint, Plaintiff specifically stated that he was unable to identify a similarly situated employee that received more favorable treatment. (Doc. 16-5 at 172-73.) Therefore, Plaintiff has failed to establish a *prima facie* case for racial discrimination related to his suspension.

## II. Age Discrimination

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.A. § 623(a)(1).

The Eleventh Circuit evaluates ADEA claims based on the same *McDonnell Douglas* burden-shifting framework applied in Title VII cases. *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013); *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 n.6 (11th Cir. 2001) ("Although the *McDonnell Douglas* framework originally applied to Title VII cases, it is now

widely accepted that the framework applies to claims of discrimination under the ADEA as well."). Thus, Plaintiff can "establish a *prima facie case* of disparate treatment under the ADEA by showing that (1) he is a member of a protected age group; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated employee outside his protected age group." *Rouse v. Donley*, No. 10-CV-224, 2012 WL 1188306, at *6 (M.D. Ga. Apr. 9, 2012) (citing *Horn v. United Parcel Servs., Inc.*, 433 Fed. Appx. 788, 792 (11th Cir. 2011)). Additionally, "the ADEA requires a 'but-for' link between the discriminatory animus and the adverse employment action as opposed to showing that the animus was a 'motivating factor' in the adverse employment decision." *Sims*, 704 F.3d at 1336.

Because the legal analysis is the same for both a Title VII and an ADEA claim, the Eleventh Circuit has stated that "district courts need not analyze each claim separately." *Cofield*, 267 F.3d 1264, 1268. As with his Title VII claim, Plaintiff has failed to identify a proper comparator with respect to his performance evaluation and suspension. Instead, Plaintiff simply recites the elements of a *prima facie* case under the ADEA without specifically identifying a similarly situated employee outside of his protected age group that was treated more favorably. (Doc. 1 at ¶ 30.) Furthermore, as explained above, Plaintiff has failed to demonstrate that his performance evaluation constituted an adverse employment action. Accordingly, Plaintiff has failed to establish a *prima facie* case of age discrimination under the ADEA.

### III. **Retaliation**

Plaintiff alleges that his suspension was issued in retaliation for filing six equal employment opportunity complaints between February 2006 and October 2010. Under Title VII, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse

employment action; and (3) there was some causal relation between the two events." *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001) (quotations omitted). "Once a plaintiff has established a *prima facie* case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Id.* If the employer accomplishes this, the plaintiff bears the "ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." *Id.* As with his disparate treatment claims, Plaintiff has failed to establish a *prima facie* case of retaliation.

There is no question that Plaintiff was engaged in statutorily protected acts by filing the equal employment opportunity complaints, and that he was subjected to an adverse employment action when he received the ten-day suspension. However, Plaintiff has failed to establish the requisite causal link between the filing of the complaints and his suspension. To demonstrate a causal connection, Plaintiff "must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. BellSouth Telecomm., Inc.,* 292 F.3d 712, 716 (11th Cir.2002) (quotation and ciation omitted). Plaintiff does not allege a causal connection in the Complaint nor has he provided any direct evidence of such a connection. Instead, Plaintiff simply alleges that his suspension occurred "contemporaneously" with his protected activities. (Doc. 1 at ¶ 53.)

While Plaintiff can meet his burden of establishing the requisite causal link "by showing close temporal proximity between the statutorily protected activity and the adverse employment action," in order to do so, the temporal relationship must be "very close." *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007). The Eleventh Circuit has held "that 'in the absence of other evidence tending to show causation,' a three-to-four month time gap between the protected conduct and the adverse employment action is insufficient to establish causation on its own." *Walker v. Sec'y, U.S. Dep't of Air Force,* 518 F. App'x 626, 628 (11th Cir. 2013) (citing *Thomas,* 506 F.3d at 1364; *Brown v. Ala. Dept. of Transp.,* 597 F.3d 1160, 1182 (11th Cir. 2010)).

Between February 2006 and October 2010, Plaintiff filed six equal employment opportunity complaints. Plaintiff also filed a complaint in this Court on June 8, 2010, alleging claims of discrimination. *See Rouse v. Donley*, No. 10-CV-224 (M.D. Ga.). Plaintiff, however, was served with the Notice of Decision to Suspend on July 11, 2011, approximately nine months after he had engaged in his most recent statutorily protected act in October 2010. That his discrimination case was still ongoing and two of his equal employment opportunity complaints were still under investigation is of no consequence. Temporal proximity is measured "between the time [the] employer learned about [the] protected activity" and the time the adverse action was taken. *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 823 (11th Cir. 2008). Therefore, the temporal gap is measured from the time Plaintiff filed his most recent complaint, October 2010, to the time Plaintiff was suspended, July 11, 2011. *See Curtis v. Broward Cnty.*, 292 F. App'x 882, 885 (11th Cir. 2008) (finding that "the relevant starting date was May 7, 2004, when Curtis filed her EEOC complaint, and the relevant ending date was February 4, 2005, when she was terminated"). Because approximately nine months elapsed during that period and because Plaintiff has offered no additional evidence demonstrating a causal link between his suspension and the protected activity, Plaintiff has failed to establish a *prima facie* case of retaliation. *See id.* (finding that a "temporal gap of almost nine months is insufficient to establish a causal connection").

Even if Plaintiff could establish a *prima facie* case, Plaintiff's claim would still fail as Defendant has articulated a legitimate, non-retaliatory reason for suspending Plaintiff for ten days. The record establishes that Plaintiff failed to follow Technical Order 1C-5A-2-6 by not capping the opening where the broken bottles were connected, and violated OI 21-19 by using Stephens' stamp to certify completion of the antenna repair. Plaintiff was given a ten-day suspension based on "the seriousness of the charges and Plaintiff's history of prior violations, including a violation for which he was suspended for 5 days in 2008 and a violation for which [Doubleday] suspended him [for] 10 days in 2010, for direct disobedience." (Doc. 16-8 at ¶ 14.) Contrary to Plaintiff's contention that no other employee within the workplace was disciplined for technical order violations, the record demonstrates

14

that thirty-six employees were punished for such violations between August 13, 2010 and January 9, 2012. (Doc. 16-1 at ¶ 17.) In fact, one such employee received a thirty-day suspension. (Doc. 16-8 at ¶ 15.) Furthermore, the record is devoid of any evidence showing that Plaintiff's punishment for violating the technical order and operating instruction was a pretext for prohibited, retaliatory conduct. Accordingly, Plaintiff has failed to establish a claim for retaliation.

### IV. **Hostile Work Environment**

Plaintiff alleges that he was subjected to a hostile work environment and sexually harassed when Stephens, while holding his crotch, approached Plaintiff and told him that he "had something for Plaintiff that 'was black and had white cream on it,'" and that Plaintiff should get on his "knees because Stephens wanted to put 'it' in Plaintiff's mouth." (Doc. 1. at ¶¶ 34, 36, 38.) "A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). To establish a hostile-environment-sexual-harassment claim under Title VII, a plaintiff must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). Defendant contends that it is entitled to summary judgment because Stephens' comment was not so severe or pervasive as to alter the terms and conditions of Plaintiff's employment. The Court agrees.

"Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." *Id.* at 1246. "The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive." *Id.*

15

(quotations and alterations omitted). Thus, to prevail, Plaintiff "must first show that [he] subjectively perceived the harassment as sufficiently severe and pervasive to alter the terms and conditions of his employment." *Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 806 (11th Cir. 2012) (quotations and citation omitted). Plaintiff has failed to make such a showing.

The Eleventh Circuit's decision in *Guthrie* is instructive. There, the court found that, because the plaintiff did not complain about the alleged harassment until long after it had begun, had asked her alleged harassers to help her return to work at the restaurant after she had voluntarily quit, admitted that she was both happy and appreciative when she returned to work, and admitted to joking with and hugging the offending coworker, the plaintiff had "failed to create a genuine issue of material fact on whether she subjectively perceived [the conduct of her supervisor and coworker] to be sufficiently severe to support her claim." *Id.* at 806-07.

The alleged harassing behavior here is much less egregious than that in *Guthrie* and Plaintiff has likewise failed to establish a genuine issue of material fact regarding whether he subjectively perceived Stephens' conduct to be so severe and pervasive as to alter the terms of his employment. Although Plaintiff complained to his supervisor about Stephens' comments, like the plaintiff in *Guthrie*, he continued to work with Stephens after the incident occurred and refused his supervisor's offer to be transferred to a different shift. In fact, Plaintiff explicitly denied feeling threatened or uncomfortable working on the same shift as Stephens.

Even if Plaintiff could establish that he subjectively perceived Stephens' comments to be sufficiently severe and pervasive to alter the terms and conditions of his employment, Plaintiff's claim would still fail as he would be unable to show that his subjective perception was objectively reasonable. The Supreme Court has emphasized "that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quotations and citation omitted). This "inquiry requires careful consideration of the social context in which particular behavior occurs" because the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances,

expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* Therefore, the objective inquiry is fact intensive and requires courts to consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246.

Evaluating the *Mendoza* factors, Plaintiff has failed to show that his alleged harassment was objectively severe or pervasive enough to alter the conditions of his employment and create an abusive working environment. First, Plaintiff has identified only one instance of misconduct and stated that no further harassment has occurred, despite remaining on the same shift as Stephens. A single instance of alleged harassment does not meet the degree of frequency needed to demonstrate a hostile work environment. *Compare Guthrie*, 460 F. App'x at 807 (holding that "a few dozen comments or actions . . . spread out over a period of eleven months" was not "sufficiently frequent"), *and Mendoza*, 195 F.3d at 1249 (holding that "a single instance of slight physical contact, one arguably inappropriate statement, and three instances" of plaintiff's supervisor making an offensive sound over an eleven-month period "were far too infrequent"), *with Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 804 (11th Cir. 2010) (finding that the harassment was sufficiently frequent where the conduct occurred on a daily basis for over three years), *and Miller*, 277 F.3d at 1276 (concluding that harassing conduct was sufficiently frequent where it occurred "three or four times a day" for one month).

Second, Plaintiff has failed to establish "a workplace that is permeated with discriminatory intimidation, ridicule and insult." *Miller*, 277 F.3d at 1275. While "rude and boorish," Stephens' conduct falls "well short of conduct so severe as to alter or change the terms of [Plaintiff's] working conditions." *Guthrie*, 460 F. App'x at 807; *see also Dar Dar v. Associated Outdoor Club, Inc.*, 248 F. App'x 82, 85 (11th Cir. 2007) (holding that "two sexually inappropriate comments and two incidents of intentional buttocks touching" were not sufficiently severe).

Third, the record is devoid of any evidence that Plaintiff was physically accosted, or in any way felt physically threatened, by Stephens. In fact, following the altercation, Plaintiff denied feeling threatened or uncomfortable working on the same shift as Stephens and refused his supervisor's offer to be transferred to a different shift. As such, Stephens' conduct cannot be said to have been physically threatening or humiliating. *See Guthrie*, 460 F. App'x at 808 (finding that the alleged conduct was not threatening where the plaintiff "conceded that she did not feel physically threatened").

Finally, Plaintiff has made no showing that Stephens' conduct "unreasonably interfered" with his work performance. Nothing in the record indicates that Plaintiff was unable to complete his work or that his job was in any way affected by Stephens' conduct. To the contrary, Plaintiff remained on the same shift as Stephens and admitted that he did not feel uncomfortable doing so. Thus, Plaintiff has failed to show that the alleged harassment unreasonably interfered with the performance of his job. *Compare Mendoza*, 195 F.3d at 1249 (concluding that "nothing in the record indicate[d] that [the supervisor's] conduct impaired [plaintiff's] job performance"), *with Miller*, 277 F.3d at 1277 (finding interference with plaintiff's job performance where harassing conduct "prevented [plaintiff] from performing his job, on at least one occasion").

As the Eleventh Circuit has explained, "not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010). "Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment." *Id.* at 807. Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)," do not amount to a hostile work environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted). Although inappropriate, Stephens' remarks are the type of off-handed comments in the course of casual conversation that the Supreme Court and the Eleventh Circuit have deemed not actionable under Title VII. *See Id.* (noting that Title VII does not apply to the "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional

18

teasing") (citation omitted); *Guthrie*, 460 F. App'x at 807-08. Accordingly, Plaintiff has failed to establish a hostile environment claim under Title VII.

## CONCLUSION

In light of the forgoing, Defendant's Motion for Summary Judgment (Doc. 16) is **GRANTED**. It is hereby **ORDERED** and **ADJUDGED** that Plaintiff shall take nothing by his Complaint (Doc. 1), and **JUDGMENT** shall be entered in favor of Defendant.

**SO ORDERED**, this 2nd day of November, 2015.

                                                    /s/ Leslie J. Abrams
                                        **LESLIE J. ABRAMS, JUDGE**
                                        **UNITED STATES DISTRICT COURT**